UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

JEFFREY SOUZA NUNES,

                              Plaintiff,                      Civil Action

           -against-                        20-cv-1092 (ALC)

NEW YORK CITY DISTRICT COUNCIL OF      ECF CASE
CARPENTERS AND JOINERS OF AMERICA,
COMMODORE CONSTRUCTION CORP., AMERICAN    **SECOND AMENDED**
WOOD INSTALLERS INC., SUPERIOR ACOUSTICS INC,   **COMPLAINT AND JURY**
JONATHAN METAL & GLASS LTD., EUROTECH    **DEMAND**
CONSTRUCTION CORP., CIVETTA COUSINS JV LLC,
CORD CONTRACTING CO., INC., NAVILLUS TILE, INC.
dba NAVILLUS CONTRACTING, and JOSEPH A. GEIGER,

                           Defendants.
------------------------------------------------------------------------x


       Plaintiff JEFFREY SOUZA NUNES ("Nunes"), through his attorneys Erlanger Law Firm

PLLC, as and for a Second Amended Complaint against defendants alleges as follows:

## THE PARTIES

    1.  Nunes resides in Queens County, New York.

    2.  Nunes is a third-year apprentice carpenter and a member of non-party United

Brotherhood of Carpenters and Joiners of America  ("UBC"), defendant New York City District

Council of Carpenters and Joiners of America ("DC"), and non-party Local Union 157 – NYC

Carpenters Union, Manhattan ("Local 157").

    3.  UBC is one of North America's largest construction trade unions.

    4.  DC, an unincorporated association with its principal offices located in New York

County, is a UBC district council and representative body consisting of nine individual local

unions with more than 20,000 members.

5.   Defendant Joseph A. Geiger ("Geiger") is DC Executive Secretary-Treasurer.

6.   Local 157 is a DC local member union.

7.   Association of Wall-Ceiling & Carpentry Industries of New York, Incorporated ("WC&C") advocates the interests of contractors, suppliers and manufacturers in the wall and ceiling industries.  Membership provides collective bargaining power for key issues in their industries.

8.   UBC entered into a memorandum agreement with WC&C, effective July 1, 2013, which was binding on the DC.  Among other things, the Memorandum Agreement insulated UBC from liability due to the action of any individual union member.

9.   DC entered into a collective bargaining agreement with WC&C, effective August 1, 2019 ("CBA"), which was backdated to August 1, 2017 except for wages, benefits, and conditions.

10.  Defendant Commodore Construction Corp. ("Commodore") is a New York corporation with its principal offices located in Westchester County, New York.

11.  Defendant American Wood Installers Inc. ("American Wood") is a New York corporation with its principal offices located in Suffolk County, New York.

12.  Defendant Superior Acoustics Inc. ("Superior Acoustics") is a New York corporation with its principal offices located in New York County, New York.

13.  Defendant Jonathan Metal & Glass Ltd. ("Jonathan Metal") is a New York corporation with its principal offices located in Queens County, New York.

14.  Defendant Eurotech Construction Corp., ("Eurotech") is a New York corporation

with its principal offices located in New York County, New York.

15.   Defendant Civetta Cousins JV LLC ("Civetta") is a New York limited liability company with its principal offices located in Bronx County, New York.

16.   Defendant Cord Contracting Co., Inc. ("Cord") is a New York corporation with its principal offices located in Nassau County, New York.

17.   Defendant Navillus Tile, Inc. dba Navillus Contracting ("Navillus") is a New York corporation with its principal offices located in New York County, New York.

18.   Defendant Commodore, American Wood, Superior Acoustics, Jonathan Metal, Eurotech, Civetta, Cord, and Navillus ("defendant employers") are member-employers of WC&C or independent signatories to the CBA or hired DC members under the CBA and are bound by its terms.

19.   At all times herein, defendant employers employed Nunes under the CBA's terms.

## JURISDICTION

20.   This civil action arises under the laws of the United States: sections 101-102 and 609 of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. 411-12 and section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. 185 & 187.  This Court has further jurisdiction under 28 U.S.C. §1331 and under the March 4, 1994 Consent Decree ("Consent Decree") so-ordered by the United States District Court for the Southern District of New York.

## INTRODUCTION

21.   This lawsuit arises from Nunes exercising his rights under the UBC Constitution and federal law to express the carpenters' opposition to the CBA, which was "ratified" by the DC

Council Delegate Body ("the delegates") without the mandatory roll call vote.

22.   The CBA threw carpenter rights and economic interests, particularly the rights of apprentice carpenters, under a bus in deference to the signatory employers

23.   Corrupt Geiger crony DC President Graham McHugh ("McHugh"), was the CBA negotiator in chief. (He later was hired by Eurotech, one of the CBA employers).

24.   The substance of negotiations was kept secret from the carpenters and their delegates. Once the proposed CBA terms had been leaked, only seven days prior to the delegates' vote, membership anger grew exponentially.  Over the course of several days, Nunes was just one of the hundreds of apprentice carpenters and journeymen carpenters seeking to channel opposition.

25.   At a rally on the day of the delegates' vote, several hundred carpenters wrote "yes" in favor of a strike on sign-in sheets.  In addition, the carpenters voice-voted for a strike.

26.   All collective bargaining agreements must be submitted to the delegates for ratification or rejection by roll call vote.

27.   Geiger crony – DC Vice President and Assistant Secretary Treasurer Michael Cavanaugh ("Cavanaugh") – treacherously and sneakily executed Geiger's corrupt plan by asking for a mere voice disapproval vote, rather than the required roll call vote on the proposed CBA.

28.   No delegate voiced disapproval as a substantial number had expected to vote against the proposed CBA during the roll call vote.  Unsworn in delegates, who had no right to vote under any circumstance, had no clue as to what was going on.

29.   The corrupt maneuvering treacherously disenfranchised carpenters.

30.   The day of CBA "ratification," several apprentice carpenters handed out flyers in front of DC headquarters and various job sites throughout Manhattan, calling for a strike the

following Monday.

31.   DC machinery went into high gear with robocalls and a posting on its website threatening carpenters with job termination and expulsion from the union if they engaged in a work stoppage.  DC also communicated to employers that any carpenter engaging in a strike would be subject to immediate internal discipline, even job termination, and loss of all employment protection under any collective bargaining or project labor agreement.

32.   The carpenters' strike organization effort fizzled, in no small part due to DC's effective countertactics.

33.   Geiger singled out Nunes for retribution because he was the most vulnerable of the apprentices, having no "connections," who might otherwise back him.

34.   Geiger first sought to throttle Nunes's free speech rights by having another crony – DC's Inspector General David Pie ("Pie") – concoct charges against him for allegedly violating the UBC Constitution.

35.   Geiger and his cronies then enlisted defendant employers to blacklist Nunes from employment.  Nunes was repeatedly fired from jobs under the pretext that there was no work. Typically, within a few days of Nunes being laid off, a defendant employer hired another carpenter to do the same work that Nunes had been doing.

36.   Another Geiger crony – New York City Carpenter Training Center ("CTC") Director of Training Peter Bennett ("Bennett") – barred Nunes from registering for required apprenticeship course training.

37.   After Nunes filed this lawsuit, DC conducted a sham trial in which the Trial Committee ("TC"), seeded with Geiger cronies, found Nunes guilty of violating the UBC

5

Constitution.  Not surprisingly, the cronies recommended that Nunes be expelled from his union.

38.   Even after the trial, DC continued to collude with at least one defendant employer to blacklist Nunes from working.

39.   Geiger's singling out Nunes for punishment accomplished his goal of cutting off carpenter opposition to an illegal CBA and ended a serious challenge to his corrupt leadership.

## COMPLAINT

### 1. Member Reaction to Secret Negotiations

40.   For the two years following the June 30, 2017 expiration of the collective bargaining agreement between DC and WC&C, the parties were negotiating a new agreement.  The rank and file carpenters received little to no information about the negotiations, and some cases, misinformation.

41.   Beginning in 2018, carpenters were becoming increasingly agitated over the lack of information.  Their questions at local and delegate meetings were met with uninformed responses.  Out of frustration, carpenters formed the NYC Rank and File Carpenters (RFC) to more aggressively seek additional, reliable information.

42.   Beginning on September 6, 2018, RFC started holding regular meetings to address lack of communication and information, but were unable to identify and organize around concrete issues that they had no knowledge of.

43.   Local 157 delegates often asked about the proposed CBA but were repeatedly told at meetings that discussions about it were canceled or postponed due to death, illness, etc.

44.   In the Fall of 2018, Local 157 Executive Committee member Joseph Connolly, a crony of Geiger crony former DC President Stephen McInnis, reported that the proposed CBA

would give carpenters a 15% raise over a five-year period, but in retrospect, they realized that was a false statement intended to head off dissent.  Indeed, things calmed down for several months, but by the Spring of 2019, carpenters were again seeking information.

45.  In June 2019, RFC's efforts focused on Local 157 delegate elections.  A slate of working carpenters, including RFC carpenters, opposed the slate of Geiger cronies, including company men, general foremen, superintendents, business agents, and other bureaucrats.  With the advantage of improperly marshaled union resources, Geiger's slate prevailed.

46.  As it turned out, key DC negotiator McHugh had earlier in his career received side cash payments from employers.  It was a clear conflict of interest for McHugh to be negotiating for carpenters.  (After he resigned from the DC, McHugh was hired by defendant Eurotech, a WC&C member commonly referred to as "EuroCash" by the carpenters for suspected side cash payments to other carpenters and DC officials).

47.  Two weeks after the June election, delegates received copies of the proposed CBA, just ten days in advance of the scheduled vote on July 10.  New delegates had not even been sworn in, and therefore had less time to review its terms.  The carpenters were calculatedly kept in the dark, and therefore could not share their positions with their delegates.

48.  On July 3, seven days before the delegates' vote, a delegate revealed its terms.  RFC members started handing out flyers at job sites, train stations and other locations to spread the word.  As carpenters began to appreciate the severe impact the proposed CBA would have, the need for drastic action to stop it from being ratified dominated discussion.  Carpenters universally perceived that delegates were not representing their interests.

49.  On the day of the scheduled delegate vote, RFC held an anti-CBA rally outside DC

headquarters at 395 Hudson Street.  Nunes conferred with several influential journeymen carpenters, who gave their verbal support on the condition that he agreed to be the front man to cover them from anticipated retaliation.

50.   At the rally, several speakers supported a strike.  Sign-in sheets prepared by carpenters were distributed and filled out by hundreds of carpenters, on which each listed his or her job site address, number of employees at the job, and whether he or she would participate in a strike?  "[YES/NO]."  The Carpenters uniformly voted "YES."

51.   Nunes twice explained the strike motion to insure carpenters clearly understood it. He explained the strike would begin the following day.  Carpenters yelled,  "yes" and "immediately." Nunes asked again if there were any "no," votes but no carpenter spoke up. Carpenters then began chanting "Strike! Strike! Strike!" repeatedly.

## 2.  Carpenters Thrown Under a Bus

### A.  Member Rights

52.   Under UBC Constitution section 2, "The objects of the United Brotherhood are: to organize workers, to encourage an apprenticeship system and higher standard of skill."

53.   Under UBC Constitution section 43A, "prior to attaining journeyman certification," apprentices must pay an initiation fee of 20% of the journeyman rate in their first year, increasing 20% per year up to 80% of the journeyman rate in their fourth year.  Journeyman certification is manifestly contemplated at the start of the fifth year.

54.   Under UBC Constitution section 26B, District Councils "shall be governed by applicable uniform Bylaws and have the power to make laws and trade rules which in no way conflict with the Constitution and Laws of the United Brotherhood."

55.   Under DC Bylaw section 3, consistent with the UBC Constitution, the objects [sic] "shall be to promote and protect the interest of our membership through broadly democratic institutions free of corrupt influence, to encourage the apprenticeship system and higher standard of skill."

56.   Under DC Code of Ethics section I, "[e]very officer, employee, and agent must set aside his or her personal interest and act only in the best interests of the union and its members." Each has the "fiduciary duty always to act in the best interests of the Union and its members."

57.   A prime purpose of  the  Consent Decree is to insure that DC "shall be maintained and run democratically."

58.    The purposes of the Consent Decree were reaffirmed in the November 18, 2014 "Stipulation Order Regarding an Appointment of an Independent Monitor" ("Stipulation").

59.   Unfortunately, the primary aspiration of the Consent Order and Stipulation has been unrealized, despite reporting to the contrary.  DC has not sustained reforms nor has it operated free from corruption, which has seamlessly moved just beneath the surface.

### B.   A Collective Bargaining Agreement Can Only be Ratified or Rejected by Roll Call Vote

60.   Under DC Bylaw section 5(B)(7), delegates *must*  "[r]eview and approve or reject in advance, all Collective Bargaining Agreements following a recommendation from the Executive Committee."

61.   Under DC Bylaw section 5(C), all approvals, rejections, or revisions must be supported by a majority of delegates "after due consideration and discussion of all relevant points of view, in accordance with the UBC Constitution and Laws and/or recognized parliamentary

procedure" at a meeting.

62.    Under DC Bylaw section 20, following recommendation of the Executive
Committee, the *delegates* shall have the exclusive power and authority to ratify and execute
collective bargaining agreements. The *delegates* are to adopt rules and procedures governing
collective bargaining agreement ratification or rejection.

63.    From about the middle of 2013, delegates required that all agreements relating to
monetary benefits, including all collective bargaining and project labor agreements, after due
consideration and deliberation, be ratified or rejected at a delegate meeting by roll call vote.  This
requires each delegate's name to be called and a "yay" or "nay" vote to be recorded next to the
name; each delegate is free to expound upon his or her vote at that moment.

64.    It was determined that a roll call vote is crucial to preserve the vote's certainty and
integrity.

65.    Prior to the CBA vote, every collective bargaining or project labor agreement had
been approved by a duly recorded roll call vote.

### C.    CBA was Corruptly "Ratified" Through Treachery

66.    Because Geiger knew that it would be a close call whether the delegates would ratify
the McHugh-negotiated CBA, even without due consideration and discussion, Cavanaugh –
Geiger's crony in charge of the meeting – treacherously executed a sneaky end run around the
required roll call vote, calling instead for mere voice disapproval.

67.    No motion had been made to change the roll call voting procedure.

68.    No delegate voiced disapproval as a substantial number had expected to vote against
the proposed CBA during the roll call vote; when the delegates realized that there would be no

roll call vote, they were shocked.  Present unsworn in delegates, who had no right to vote under any circumstance, had no clue as to what was going on.

69.   Geiger and Cavanaugh's corrupt maneuvering treacherously disenfranchised carpenters, through their delegates, from a democratic vote on the CBA.

**D.   CBA Damaged Carpenter Rights and Economic Interests**

70.   The CBA  "Market Recovery Addendum" ("Addendum"), among other things threw apprentice carpenters under a bus.  It might as well have been called the "Geiger/ McHugh Gift to WC&C Employers at the Carpenters' Expense Addendum."

71.   Men and women were enticed to join DC local unions with the promise that after four years (5,200 hours) as an apprentice carpenters and completion of CTC apprentice classroom training, they would become journeymen paid at maximum wage and benefits.

72.   The Addendum retained the "journeymen" classification but morphed it into a super-apprentice category.  It then created a "certified journeyman"  or super-journeyman classification, which included only then journeymen.

73.   The reclassifications require apprentice carpenters to accumulate 10,000 hours of experience or an 4,800 additional hours as super-apprentices, before they can become certified journeymen and receive maximum pay and benefits.  On Manhattan commercial jobs, for example, certified journeymen receive a $100.16/hour wage/benefits package, while super-apprentices are stuck at a $66.82/ hour wage/benefits package over four years.  The apprentice/super-apprentice year-over-year wage/benefit packages only increase at a paltry $0.75 year-over-year.

74.   The CBA will thus result in an approximately $30,000 annual pay reduction per year

to each super-apprentice carpenter.

75.   The CBA is working a hardship on certified journeymen, who are being hired less frequently in preference to journeymen/super-apprentices.

76.   The CBA is resulting in lower per hour contributions to the carpenter's pension fund, from $12.86/hr to $5.00/hr for 60% of carpenters.

77.   The CBA is resulting in carpenters losing time and one-half hourly pay for pre-7am start times.  The new flex start time is 6am, rather than 7am, at the normal hourly rate.  This will work a hardship on early commuting carpenters.

78.   The CBA is resulting in laid off carpenters not being paid until the end of the company's pay period, causing cash flow hardship to them but a cash flow benefit to employers.

**3.   Carpenters Rally Against CBA**

79.   The day after the delegates' vote, carpenters rallied across the street from the One Vanderbilt jobsite.  But insufficient numbers were present, so they voted to rally again the following Monday and raised more than $100 to print flyers with the new date.

80.   Nunes and four to five other apprentice carpenters had the flyers printed.  The flyer encouraged carpenters to rally at major job sites on July 15 to encourage carpenters to walk off their jobs to protest the CBA.  The flyers were distributed at job sites, including the New York Public Library and Manhattan West, en route to DC headquarters, where Nunes and two other apprentice carpenters handed out flyers.  After lunch, three apprentice carpenters headed to Penn Station to distribute flyers to carpenters heading home.  The carpenters' overwhelming reaction was anger over the CBA and support for work action.

81.   On the same day as the rally, Geiger's machinery roared into high gear with

robocalls to carpenters and a posting on the DC website threatening them with termination if they engaged in work action.  DC also immediately communicated to employers that work action was unauthorized, striking carpenters could face removal, and striking apprentice carpenters would be thrown out of the union.

82.   Between July 11 and 15,  members were openly calling for a strike on Facebook, sharing texts from foremen carpenters who were encouraging a strike.  Other trades began discussing work action to support the carpenters.

83.   Nobody from DC contacted Nunes to tell him that he was violating any UBC Constitutional provision, DC Bylaw or rule, or collective bargaining or project labor agreement.

84.   By July 15, the carpenters realized that they had insufficient numbers to mount a successful work action and abandoned the idea.

85.   DC's countertactics had prevailed.

**4.   Geiger Singled Out Nunes for Retaliation**

**A.   Concocted Charges Filed Against Nunes**

86.   On July 18, Geiger singled out Nunes for punishment, directing retaliation against only him from among the hundreds and hundreds of dissenting carpenters.  Nunes was targeted because as a third-year apprentice without union connections, he was deemed an easy mark and pushover.

87.   Geiger initially told Nunes that his crony Pie had filed charges against him.  When pressed, Geiger accepted direct responsibility.  Nunes was charged with violating UBC Constitution sections 51(A)(1) – "Causing dissension among members of the United Brotherhood" – and 51(A)\(12) – violating the "Obligation" or fraternal pledge:

13

> I do, of my own free will and accord, solemnly and sincerely promise-on my sacred honor-that I will never reveal-by word or deed-any business of this United Brotherhood-unless legally authorized to do so. I promise to abide by the Constitution and Laws-and the will of the majority-observe the By Laws and trade rules established by Local Unions and Councils affiliated with the Brotherhood ... I pledge myself to be obedient to authority-orderly in the meetings-respectful in words and actions and charitable in my judgment of my brother and sister members ....

88.    Both Sections are broadly worded, inviting corrupt leadership to concoct false charges to intimidate and expel carpenters, who demand that their rights and economic interests be protected.

89.    The alleged factual basis supporting the charges was based on a DC Office of the Inspector General "investigation:" (1) at the July 10 rally, protesting the proposed CBA, Nunes was distributing flyers informing the carpenters there that he (and nobody else) was organizing a strike, and (2) Nunes (and nobody else) was using social media to promote and encourage carpenters to strike.

90.    The charges against Nunes were concocted.

91.    First, Nunes did not "cause dissent."  Rather, it was Geiger and his cronies' collusion with employers at the carpenters' expense that caused dissension.  Slavish obedience to union authority might have been the order of the day in 1881 when the UBC Constitution was promulgated.  But union members have federally protected rights and an obligation to call out corrupt union leadership.

92.    Second, flyers were not handed out at the July 10 rally but by many apprentice carpenters on July 11.  Only Nunes was charged with violating the UBC Constitution.

93.    Third, many carpenters used social media to reach out to other carpenters for support

of opposition to the CBA.  Only Nunes was charged with violating the UBC Constitution.

94.   The charges against Nunes were intended to, and succeeded in intimidating other carpenters, with far more to lose, from continuing to protest the CBA, even to this day.

**B.   Defendant Employers Blacklist Nunes**

95.   Following the concocted charges, beginning on August 9, 2019, Geiger and his cronies further put the screws to Nunes by colluding with defendant employers to fire Nunes from jobs.

96.   Defendant employers are member-employers of WC&C or independent signatories to the CBA or hired DC members under the CBA and are bound by its terms.

97.   The following CBA provisions guarantee that Nunes had a right to be hired by and work at any job under a WC&C member or independent signatory or any subcontractor that hired CD carpenters pursuant to the CBA, including Cord Contracting and Eurotech: all of the extensive work set out in the CBA (id. Art.II §2), is to be assigned to carpenters (Id. Art.II §3); any DC carpenter has "the privilege of working for whomever [he sees fit]" subject to an employer's right to discharge the employee, but only under the CBA's terms (Id. Art.V §3); and there shall be no discrimination in employment on the basis of union activity (Id. Art.VII §2).

98.   Defendant employers were eager to accommodate Geiger as he and his cronies had corruptly negotiated the CBA with WC&C and rammed through "approval" of the CBA. which was highly favorable to them.

99.   Commodore hired Nunes on July 24, 2019 at the 200 Park Avenue, Manhattan job site.

100.   When DC learned Nunes was on the job, Commodore in collusion with DC,

terminated him on August 9, 2019, allegedly for lack of work.

101.   American Wood hired Nunes on August 13, 2019 at the New York Library Main Branch work site.

102.   When DC learned Nunes was on the job, American Wood, in collusion with DC, terminated him on August 15, 2019, allegedly for lack of work.

103.   Jonathan Metal hired Nunes on August 16, 2019 at the U.S. Post Office, 90 Church Street, Manhattan, and moved him around different job sites.

104.   When DC learned Nunes was on the job, Jonathan Metal in collusion with DC, terminated him on September 5, 2019,  allegedly for lack of work.

105.   Superior Acoustics hired Nunes on or about September 14, 2019 at the 1114 Avenue of the Americas, Manhattan job site.

106.   When DC learned Nunes was on the job, Superior Acoustics, in collusion with DC, terminated him two days later, allegedly for lack of lack of experience in his trade and being "too expensive," despite his job being at reduced pay.

107.   Commodore hired Nunes again on or about September 13, 2019 at the 101 West 57 Street, Manhattan job site.

108.   When DC Business Agent Michael Piccirillo came to Commodore's work site and learned Nunes was on the job, Commodore in collusion with DC, terminated him the same day, allegedly for lack of work.

109.   Eurotech hired Nunes on September 20, 2019 at the 76 Fifth Avenue, Manhattan job site.

110.   When a DC learned Nunes was on the job, Eurotech in collusion with DC,

terminated him on September 23, 2019,  allegedly for lack of work.

111.   Civetta Cousins hired Nunes on October 24, 2019 at the York Studios, 1421 Story Avenue, Bronx job site.

112.   When  DC learned Nunes was on the job, Civetta Cousins, in collusion with DC, terminated him on November 6, 2019,  allegedly for lack of work.

113.   Civetta Cousins hired Nunes again at the same job on December 12, 2019 to make it seem like he was not being denied work.

114.   In collusion with DC, Civetta Cousins terminated him again on December 16, 2019, allegedly for lack of work.

115.   Cord Contracting hired Nunes on January 17, 2020 at the LaGuardia Airport, Terminal B job site.

116.   When DC learned Nunes was on the job, Cord Contracting, in collusion with DC, terminated him on January 29, 2020,  allegedly for lack of work.

117.   Nunes did not understand that he had been blacklisted until he had been pretextually fired from several jobs

### C.   Nunes's Trial was a Procedural and Substantive Sham

#### 1.   Procedure

118.   Under UBC Constitution section 26B, a District Council  "shall ... have the power to make laws and trade rules which in no way conflict with the Constitution and Laws of the United Brotherhood."

119.   Under UBC Constitution section 52(A), any member charged under section 51, "shall be given a fair and impartial trial."

17

120.   Under UBC Constitution section 52(J)(5), each party "shall have the right to cross-examine witnesses presented by the other party."

121.   Under UBC "Charges, Trials and Appeals," there is no provision allowing into evidence an affidavit in place of live testimony.  Indeed, section VI(F)(4) confirms an accused carpenter's right to cross-examine any witness presented by the other party.

122.   Under UBC Constitution section 26B, a District Council does not have the power to make any law or rule that in any way conflicts with the Constitution and Laws of the United Brotherhood.

123.   In blatant violation of Nunes's right to confront an adverse witness, DC's Trial Procedures allow "testimony" by affidavit.  While trials shall be conducted per UBC Constitution section 52(J)(5), the Trial Procedures illegally and arrogantly declare, in the event of a conflict with 52(J)(5), "these rules shall prevail."  Allowing trial by affidavit is the product of corrupt leadership, shielding such leadership and their cronies from being subjected to cross-examination.

124.   DC cannot use the UBC Constitution as a sword and a shield: using section 51 to charge carpenters, and at the same time, denying carpenters the ability to defend themselves with rights guaranteed under the connected section 52.

125.   The DC rule allowing affidavits as evidence at carpenter trials must be void and of no legal effect.

126. The UBC Constitution is silent as to the selection of a trial chairman.  DC Trial Procedures call for appointment of professional Trial Chairs ("TChair").  But any TChair is to be an independent and impartial hearing officer.

18

127.   Under Trial Procedures, a DC appointed TChair may serve endlessly unless terminated with the approval of the U.S. Attorney for the Southern District of New York.   This presents a serious problem on its face.  As TChairs are endlessly on the DC's payroll, and may only be removed for good cause, it is reasonable to presume that a professional TChair who wishes to keep his or her job cannot incur the displeasure of corrupt DC leadership.

128.   Santo Barravecchio ("Barravecchio") – Of Counsel to law firm Feldman Kramer Monaco – has been a TChair for more than seven years.  Barravecchio's bio lists a single job: "Trial Committee Chairperson, NYC District Council of Carpenters, New York, New York Jan. 2013-present."

129.   The bio further lists Barravecchio's TChair duties, including "consulting with the Inspector General's Office."  Which begs the question, why would an "independent" and "impartial" TChair consult with an accused carpenter's adversary?

### 2.  **Sham Trial**

130.   Nunes's trial began on February 27, 2020, after being postponed twice.

131.   The DC was represented by Geiger crony Pie.

132.   The Trial Committee (TC), with the exception of one member, was selected from the Geiger tree of cronies.

133.   Local 157 delegate Warren Collins is a crony of Geiger crony DC President and Local 157 delegate Paul Capurso ("Capurso").  Local 2287 delegate and business agent Kevin Fleming is a pal of Geiger crony Cavanaugh.  Local 157 organizer Gerry Matthews is a Geiger crony.  Local 1556 delegate Collette McCready is a crony of Geiger crony Local 1556 President, delegate and Geiger campaign manager Chris Parzyck.  And Local 157 delegate Christopher

Sommese is a crony of Geiger crony Local 157 delegate and Trustee Jeremy Milin, who is running for DC Trustee with Geiger's backing; Sommese was also an employee of defendant Commodore.

134.   Nunes was represented at trial by a fellow carpenter, as the UBC Constitution only allows representation by a member.  Nunes's well-meaning carpenter advocate did not have the tools or inside knowledge to adequately defend Nunes, including objecting to selection of the TChair and TC members, and making proper and timely objections to proffered evidence.

135.   Among other things, Barravecchio blatantly abused his discretion by: allowing into evidence irrelevant or flawed documents; sustaining objections that were never made; allowing the TC to give whatever weight it wanted to an Affidavit; allowing witnesses to testify to irrelevant material; and recasting DC witness testimony in a light most favorable to it.  At one point, Pie ludicrously referred to Barravecchio as "your Honor."

### A.   Improperly Admitted Evidence

136.   DC first offered into evidence an excerpt of the One Vanderbilt Project Labor Agreement ("PLA").

137.   PLA Article 7, Section 1, states that there shall be no "strikes, sympathy strikes, picketing, work stoppages, slow downs, hand billing, demonstrations or other disruptive activity" on "Project work" by any union or *employee*.  Objecting to the document, Nunes declared he had not been employed at One Vanderbilt, thereby showing its irrelevance.

138.   Over objection, Barravecchio abused his discretion by allowing the PLA excerpt into evidence and immediately giving it to the TC for review without witness connection to any fact in evidence.

20

139.   DC next offered into evidence a six-page settlement agreement between it and Tutor Perini as "an example of repercussions of an unauthorized strike."  This agreement was manifestly irrelevant.  First, it had nothing to do with the two charges against Nunes, which did not include "potentially costing DC money."  Second, the argument itself was preposterous.  It always costs a union to strike, so that if cost was the deciding factor, a union should never strike. And third, the document pertained to a 2012 or 2013 union authorized strike during contract negotiations, not a proposed (but failed) work action.

140.   The third DC document offered into evidence, was a version of the July 11 flyer, with "Jeffrey Carlos Compa Nunes, New York City rank and file carpenter" across the top.  This flyer version was lifted from Nunes's Facebook page, but the flyer that had been handed out did not have Nunes's identifying information.  Barravecchio himself improperly examined Geiger crony Bennett, with leading questions to authenticate the flyer.  Based on Bennett's false testimony that the flyer with Nunes's information across the top was what he had been handed on July 11, and remarkably even without asking Nunes whether the document was objected to, Barravecchio accepted it into evidence and immediately handed it to the TC to review.

141.   Aside from Barravecchio taking the DC's part in entering the flyer into evidence, it was highly prejudicial to Nunes because it had the effect of wrongly identifying him as the work action instigator.  That Bennett was later cross-examined as to the flyer did not undo the damage done.

## B.   Flawed and Irrelevant Witness Testimony

142.   DC's first witness, Geiger crony Cavanaugh, was the very person who executed the illegal CBA "ratification."  Which begs the question, how could a union officer, whose illegal

conduct led to the subject of the carpenters' rise to opposition, give testimony as to the dissension or speculative effect of it?

143.   Cavanuagh did nothing to advance DC's case.  He had no concept of what the PLA actually says, but he knew that Nunes had not been employed at One Vanderbilt.  Accordingly, no connection between Nunes and the PLA was shown.

144.   Cavanaugh's irrelevant and highly prejudicial testimony as to the cost to the DC of a *union authorized strike* was improperly allowed in.  PLA Article 7, Section 3 provides that DC "shall not be liable for the unauthorized acts [by it] of a Local Union or its members." Accordingly, Cavanaugh's testimony as to the alleged speculative cost to DC of a *member* called strike was also false.

145.   Cavanaugh's entire "cost" premise was preposterous.  First, if cost to a union is the deciding factor in whether to strike, Cavanaugh made the case that a union should never strike. And second, Cavanaugh was comparing apples to oranges: a union authorized strike in comparison to an attempted carpenter work action.

146.   Cavanaugh also failed to reveal DC's robocalling and online threats to the carpenters, as well as its advisories to employers that the carpenters' action was unauthorized, which further insulated the DC from liability.  Instead, he deliberately created the false impression that the DC was a helpless victim.

147.   DC's second witness was Geiger crony Bennett.

148.   Bennett falsely testified that the flyer in evidence, which repeatedly referred to as a pamphlet, was what he had been handed by Nunes on July 11.

149.   Bennett testified that he had given the flyer to Pie because he believed calling for a

strike violated the DC Bylaws.  This was also false testimony because there is no DC Bylaw addressing a carpenter called work action.

150.   Barravecchio improperly recast a portion of Bennett's testimony in a way that was highly favorable to DC, and later without a voiced objection by Pie, raised his own objection, falsely stating into the record that "there was no testimony by the witness [Bennett] that he stated anything about the respondent [Nunes] violating the bylaws."  Barravecchio then refused Nunes's advocate's request to go back to the record, where Bennett had indeed stated that Nunes had violated the DC's Bylaws, so that he could be cross-examined.

151.   Barravecchio's advocacy for DC was crucial to the ultimate verdict as it deprived Nunes of the opportunity to show that he was accused of violations that were, in fact, not violations.

152.   DC's third witness, Chief Compliance Officer and Geiger crony Josh Leicht ("Leicht"), gave redundant testimony as to the flyer, which he had been handed by Pie when they manipulated Nunes at an "interview"in August 2019.  Like Cavanaugh, Leicht was allowed to testify to irrelevant and highly prejudicial information as to the speculative cost to DC of a *union-called strike*.  The same flawed reasoning that applies to Cavanaugh's testimony applies to Leicht's testimony.

153.   Finally, DC offered into evidence the Affidavit of Local 157 Treasurer and delegate Anthony Madaio ("Madaio"), crony of Geiger crony Capurso.  Although DC Trial Procedures allow consideration of a sworn statement by affidavit – an illegal and total nullification of a member's right to confront an adverse witness – Barravecchio abused his discretion by allowing the TC to give the Madaio Affidavit whatever weight it wished.  Even the illegal DC Trial

Procedures provide that the affidavit of a witness unavailable for cross-examination "shall be received in evidence but will be accorded less weight than live testimony."

154.   None of the DC officers, who Nunes had noticed to testify, including Geiger, appeared at trial.

155.   Notwithstanding that Pie had failed to produce any relevant document or witness, the Geiger crony TC found Nunes guilty and recommended his expulsion from the union.

### D.   CTC Bars Nunes from Apprentice Carpenter Classroom Training

156.   CTC is controlled by DC leadership and operates the apprentice carpenter training program.

157.    Under CTC Rules and Regulations, each apprentice must participate in four weeks of classroom training, of at least 35 hours per week, in addition to mandatory evening classes, for a total of 144 required hours each year of apprenticeship.

158.   CTC schedules apprentice classes and notifies each apprentice of the schedule approximately two weeks before the start date.  Apprentices must be scheduled for a minimum of two weeks of classroom training per semester.  If an apprentice does not receive notification of a class, it is his obligation to call CTC to confirm the schedule.

159.   If missed classes are not made up within two weeks, the apprentice will receive an "extension" but no credit for the course and the duration of apprenticeship training will be extended by six months, resulting in a six-month delay of an apprenticeship pay increase.

160.   If an apprentice is subject to two academic extensions, he must sign a "104 compliance letter"; failure to sign or comply with its terms could possibly lead to expulsion from the apprentice program.

161.   By March 2020, CTC had not scheduled Nunes for his first required week of classes even though other third-year apprentices had been scheduled.

162.   On March 9, Nunes went to CTC where he spoke with Bennett.  Nunes asked Bennet why he had not been scheduled for class; he seemed flustered and explained they occasionally shuffle students to allow others to "catch up."  After separate consultation, Bennett returned and told Nunes he was scheduled to start March 30 but it was "not in the program yet." Nunes later followed up with a CTC secretary, who informed him that his classes had not been scheduled.

163.   Bennett later falsely told Nunes that he had been given two extensions because of poor attendance and improperly asked him to sign a 104 compliance letter.  In fact, Nunes been asked to leave class once because he had used a smokeless cigarette but he was rescheduled, continued with classes for six months, and received his scheduled pay raise on time.  Per CTC Rules, Nunes did not need an extension and never received one.  Continuing his corrupt conduct, Bennett never rescheduled Nunes's class training.

164.   As further integral part of apprentice training, third-year apprentices attend a voluntary training program in Las Vegas, for which CTC makes all arrangements.  On February 27, the same day as his trial, Nunes received email confirmation of his registration and purchased air ticket from the CTC administrator.  The next day, he told her that the TC had recommended he be expelled from the union, and therefore, he was unsure what the consequences would be. On March 2, the administrator emailed Nunes that his "attendance was not required," and several hours later, falsely wrote that the Las Vegas flight had been overbooked.  On March 9, Bennett affirmed the false statement.

165.   Not surprisingly, Bennett has steadfastly refused to respond to Nunes's request for proof of the flight overbooking.

**E.**      **Post-Trial Blacklisting**

166.   Nunes was referred to a Navillus job at Penn Station from the Out-of-Work list on March 24.

167.   On March 25, he was misinformed that the third-year apprentice position was canceled.  But a week later, Nunes learned that someone else had been hired.

168.   Nunes's non-hiring was the result of a DC telling Navillus that Nunes should not be hired, notwithstanding Nunes's right to work under both the CBA and the Consent Decree.

**5.**      **Complaints Over the Vote Were Made to the IM's Investigator**

169.   The Stipulation that created the Independent Monitor (IM) does not give him authority to review the *content* of any collective bargaining agreement.  But under Stipulation Paragraph 5(a), he has the general authority to investigate allegations of corruption or wrongdoing by any DC officer, representative, agent or employee.  Any other matter may be brought to him for review under subsection 5(e)(ii).

170.   Complaints were made about the corrupt no-roll call vote to the IM's investigator at least as early as October 2019.

171.   Reasonably assuming that the investigator communicated the complaints to the IM, it is not apparent that there was any interest in following up on the treacherous, damaging and corrupt "ratification" vote.

**6.**      **Nunes was not Required to Exhaust Grievance Procedures**

172. DC Bylaw section 2 mandates that any Bylaw must conform with the Consent

Decree, Stipulation, and other orders of this Court, and to the extent it is inconsistent, it shall be null and void and of no force or effect.

173.   DC Bylaw section 3 requires that the carpenters' interests be protected "through broadly democratic institutions free of corrupt influence."

174.   Geiger and his cronies' undemocratic conduct violated the DC Bylaws, Consent Order, and Stipulation, and therefore, recourse to the Court is required.

175.   Nunes was already subject to a corrupt trial six months after he had been charged.

176.   Nunes was not required to follow further DC grievance procedures before filing this lawsuit.

177.   Moreover, even if Nunes was required to pursue further grievance procedures, such pursuit would be futile and unreasonably delay his chance to obtain a fair judicial hearing on the merits.

178.   Geiger singled out Nunes for retribution by way of concocted charges, job blacklisting, and barring him from apprentice training, and Nunes was subjected to and participated in a sham trial.

179.   UBC Constitution section 6(D), specifically reserves the UBC's right to establish a trusteeship over any subordinate body or remove any subordinate body officer where: (1) the subordinate body as bargaining agent does not protect member interests and rights or (2) the subordinate body's affairs are conducted in a manner detrimental to member welfare.

180.   UBC did not exercise its constitutional obligation to protect carpenters, indeed, in line with UBC's agreement with WC&C, both UBC and Geiger threw carpenter rights under a bus in deference to the employers.

181.   Filing a grievance with the UBC by letter is precatory.  Even if it was mandatory, under the circumstances, Nunes cannot be required to exhaust UBC grievance procedures.  And engaging in such procedures would unreasonably delay his chance to obtain a fair judicial hearing on the merits.

### FIRST CLAIM FOR RELIEF
(LMRDA Violation)

182.   Plaintiff repeats and realleges each and every allegation of Paragraphs 1 through 181 as if more fully set forth herein.

183.   The Labor Management Reporting and Disclosure Act, 29 U.S.C. 401 et .seq. ("LMRDA") was enacted to encourage union democratic self-governance and curb widespread abuses and corruption among union leadership.

184.   Under DC Code of Ethics, each DC officer must exercise his or her fiduciary duty to act only in the best interests of the union and carpenters.

185.   Geiger's corrupt conduct through his network of cronies, violated federal law, the orders of the United States District Court for the Southern District of New York, UBC Constitution, and DC Bylaws, all of which require the DC to be run democratically, without corruption.

186.  Since as early as 2013, the delegates required a roll call vote on all collective bargaining and project labor agreements.  During the roll call, each delegate would vote "yay" or "nay" and articulate his or her viewpoint if desired.

187.  Democratic operation of DC is a wholly internal matter and only indirectly operates on a collective bargaining agreement.

188.   Geiger and his cronies corruptly and treacherously conducted a sneaky and illegal voice vote (further taking advantage of clueless, newly elected but unsworn in delegates who were unaware that a roll call vote was required).

189.   29 U.S.C. 411(a)(2), union member "Bill of Rights," guarantees the right to freely meet and assemble and express any views, arguments or opinions concerning union policies

190.   There was no UBC Constitution or DC Bylaw or rule that prevented the specific dissenting conduct of Nunes or other carpenters.  The CBA was illegally ratified, and therefore, not legally binding.  And Nunes was not employed at the time under any project labor agreement.

191.   29 U.S.C. 529 prohibits the expelling or otherwise disciplining a union member for exercising guaranteed rights.

192.   Under 29 U.S.C. 411(a)(4), Nunes was not required to exhaust reasonable hearing procedures beyond four months.

193.   29 U.S.C. 412 authorizes a civil action for relief by any union member whose rights have been infringed.

194.   Geiger personally singled out Nunes for punishment from all of the carpenters  who opposed the CBA.  By doing so, he communicated to carpenters that any challenge to his corrupt control and conduct would suffer immediate retribution.

195.  29 U.S.C. 411(a)(5) guarantees union members a full and fair hearing, consistent with the traditional concepts of due process, before they can be disciplined. Due process includes the right to confront one's accusers.

196.   Under 29 U.S.C. 411(b), any bylaw that is inconsistent with section 411(a) rights shall be of no force or effect.

197.   The sham trial violated Nunes's due process rights.

198.   As a direct consequence of violating Nunes's LMRDA rights, he suffered damages including loss of income, the ability to continue as an apprentice carpenter, and the rights and privileges of union membership.

199.   Defendants' conduct was malicious, entitling Nunes to punitive damages.

## SECOND CLAIM FOR RELIEF
(LMRA Violation)

200.   Plaintiff repeats and realleges each and every allegation of Paragraphs 1 through 199 as if more fully set forth herein.

201.   The Labor Management Relations Act, 29 U.S.C. 185, protects the right of union members under collective bargaining vis-a-vis their unions and employers.

202.   As to the CBA negotiation and ratification, DC conspired with employers to represent their best interests rather than those of carpenters.

203.   Defendant unions and employers colluded to blacklist Nunes from jobs.

204.   DC breached is duty of fair representation to Nunes.

205.   Defendant employers breached CBA provisions that required Nunes to be hired and allowed to continue to work at job sites.

206.   As the result of defendants' conduct, Nunes suffered damages.

207.   Defendants' conduct was malicious, entitling Nunes to punitive damages.

WHEREFORE plaintiff Jeffrey Souza Nunes demands judgment against defendants for compensatory and punitive damages, reasonable attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
       November 6, 2020

                        ERLANGER LAW FIRM PLLC
                        Attorneys for Plaintiff

                        By: s/ Robert K. Erlanger
                            Robert K. Erlanger (RE-0886)

                        122 East 42 Street, Suite 620
                        New York, New York 10168
                        (212) 686-8045
                        rke@erlangerlaw.com

## JURY DEMAND

    Plaintiff hereby demands trial of all issues by jury.

Dated:  New York, New York
        November 6, 2020

                        By: s/ Robert K. Erlanger
                            Robert K. Erlanger (RE-0886)